```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    VISHAL BHAMMER,                    )
                                         )
 4                Plaintiff             )
                                         )
 5          -VS-                        )  CA No. 15-14213-FDS
                                         )  Pages 1 - 38
 6    LOOMIS, SAYLES & COMPANY, L.P.,   )
                                         )
 7                Defendant             )

 8

 9                          MOTION HEARING

10          BEFORE THE HONORABLE F. DENNIS SAYLOR, IV
                     UNITED STATES DISTRICT JUDGE
11

12

13

14

15                                 United States District Court
                                    1 Courthouse Way, Courtroom 2
16                                  Boston, Massachusetts  02210
                                    May 24, 2016, 2:01 p.m.
17

18

19

20

21

22

23                       LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
24                 United States District Court
                   1 Courthouse Way, Room 7200
25                      Boston, MA  02210
                        (617)345-6787
```

1    A P P E A R A N C E S:

2        PATRICK J. HANNON, ESQ. and BARBARA A. ROBB, ESQ.,
     Shilepsky Hartley Robb Casey Michon, LLP, 11th Floor,
3    155 Seaport Boulevard, Boston, Massachusetts, 02210,
     appearing for the Plaintiff.
4
         JAMES W. BUCKING, ESQ., Foley Hoag LLP,
5    155 Seaport Boulevard, Boston, Massachusetts, 02210-2600,
     appearing for the Defendant.
6
         ROBERT A. FISHER, ESQ., Seyfarth Shaw LLP,
7    Seaport East, Two Seaport Lane, Suite 300, Boston,
     Massachusetts, 02210, appearing for the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  You may be seated.  Court is now in

3  session on the matter of Vishal Bhammer v. Loomis Sayles,

4  Civil Action No. 15-14213.  Will counsel please identify

5  themselves for the record.

6          MR. HANNON:  Good afternoon, your Honor.  Patrick

7  Hannon for the plaintiff.  With me is Barbara Robb.

8          THE COURT:  All right, good afternoon.

9          MR. BUCKING:  Good afternoon, your Honor.  James

10 Bucking and Robert Fisher of Foley Hoag for the defendant.

11         THE COURT:  All right, good afternoon.

12         All right, this is a hearing on defendant's motion

13 to dismiss.  Before we get there, I think, unless I'm

14 missing something, I'm going to need a supplemental

15 statement from the plaintiff.  The defendant is a limited

16 partnership, and the allegations in the complaint treat it

17 as a corporation.  Jurisdiction here is based on diversity,

18 and so I need the citizenship of every member of the LP to

19 insure that there is diversity.  The plaintiff is, I think,

20 a citizen of India who lived in Hong Kong, and I doubt that

21 this is going to be an issue, but, still, why don't I give

22 you let's say a week to get any supplemental statement on

23 file indicating complete diversity?

24         MR. HANNON:  Yes, your Honor.

25         THE COURT:  And just as an aside, this is

1    something that is bedeviling me and the Federal Courts, in

2    which LLCs and LPs and LLPs are treated as corporations, and

3    so I have probably -- not picking on Mr. Hannon -- it's

4    probably the 50th time I have had to do something like this.

5    You know, the rules are what they are.

6            With that, let me hear from the defendant.

7    Mr. Bucking, it's your motion.

8            MR. BUCKING:  Yes, your Honor.  Your Honor, I want

9    to begin by just briefly describing what I think are the

10   core allegations in the complaint to set the context for the

11   argument.  We're dealing with a plaintiff who is an

12   experienced financial services professional, who at the time

13   of his courtship by my client, Loomis Sayles, was working at

14   Macquarie, which is a global financial services firm.  The

15   discussions involved a new hedge fund that was going to be

16   launching in Asia in approximately 2015.  Preparations for

17   the launch began in 2014.  Loomis hired somebody to run the

18   fund, Michael McDonough, and hired an additional analyst by

19   the name of Jeff Dorr, and the discussions with Mr. Bhammer

20   began in January of 2015 and continued until June.

21           The key discussion that leads to the

22   misrepresentation claim occurred in a Skype phone call in

23   late January of 2015 between Mr. Bhammer and Mr. McDonough,

24   who Loomis had hired to run the firm, and there are three

25   claims, three statements from that call that I think are the

1    core statements that are at issue here:  One is that Loomis

2    represented in that call that the fund had an appropriate

3    and well-defined process and strategy; two, that that

4    process and strategy had been thoroughly reviewed; and,

5    three, that the fund met Loomis's criterion for launching a

6    new fund.

7            Now, there are a series of conversations that

8    follow in February and March and April with other

9    representatives of Loomis, and I submit to the Court, if you

10   look at the specifics of those, they all relate back in some

11   way to the original statements made by Mr. McDonough in that

12   call to the extent that the company was committed to the

13   fund, that it was progressing in accordance with the

14   original discussion, that the company was proceeding slowly

15   and carefully to insure a successful launch, and the company

16   was making a long-term commitment to the fund.  And so there

17   are some additional generic statements that are alleged in

18   the complaint, but really the ones that matter and the ones

19   that plaintiff is relying upon occurred in the Skype call

20   with Mr. McDonough.

21           I also think it's important to notice in the

22   complaint a couple of other things, both for what they say

23   and for what they don't say.  The complaint alleges in

24   Paragraphs 17 and 18 that shortly after the Skype call with

25   McDonough, that McDonough provided a PowerPoint.  Now, we

1    don't know anything about the PowerPoint, and it's not

2    described in the complaint in any detail.  We don't know

3    what facts are contained in the PowerPoint, but we know that

4    a PowerPoint was provided.  The complaint alleges that

5    Mr. Bhammer reviewed it and discussed it with McDonough.

6              We also know that on June 11 there was another

7    PowerPoint.  This is, again, referenced in the complaint.

8    We also don't know anything about that PowerPoint.  The

9    allegations in the complaint are that the PowerPoints

10   confirmed what McDonough and other representatives of Loomis

11   told Mr. Bhammer.

12             We also know that in the June, 2015 time frame,

13   certain logistical discussions are occurring about start

14   date and where Mr. Bhammer will be working, and a training

15   period, and timing of things like his move and his

16   resignation from his current employer.  And then on July 16,

17   six months after the phone call between McDonough and

18   Bhammer, Loomis tells Bhammer that it is abandoning the

19   fund, and later said to him that that was based on a

20   "recent assessment" of the fund's process and other details

21   of the fund.  So that's what we know from the complaint, so

22   an initial call in January.  Six months go by where

23   essentially Loomis is telling Mr. Bhammer that things are

24   progressing in accordance with the original discussion, and

25   no details about any of the specifics but really simply

1    characterizations of the process, that Loomis had reviewed

2    it, that it met its criterion, that it was progressing,

3    things of that nature.

4            With that context, your Honor, let me suggest how

5    we look at the complaint and how we submit that the Court

6    should look at the complaint, all of which are grounded in

7    the legal principles that we've extensively briefed.  One is

8    that we are not dealing with a sale of 20,000 soles of

9    shoes.  We're not dealing with roofing material that's

10   manufactured according to specific standards.  We're dealing

11   with an inherently volatile endeavor.  We're dealing with a

12   brand-new hedge fund launching in Asia in the middle of what

13   at best can be described, and we should all appreciate to

14   be, an uncertain global financial market.  A misrepresentation

15   claim of this sort needs to be based upon facts that are

16   verifiable, facts that you can objectively say, that's true

17   or it's not true, not based upon characterizations.

18           THE COURT:  Well, but the plaintiffs do cite these

19   lines of cases that say under some circumstances, of course,

20   limited circumstances, but even an opinion or a predictive

21   statement or forward-looking statement could be actionable

22   if it implies the existence of a fact, right?  In other

23   words, it can be context-driven.  I mean, there has to be a

24   factual statement underlying it, but even something on its

25   face that looks like an opinion could be actionable as

1    misrepresenting a fact, I guess is the point.

2         MR. BUCKING:  Right, your Honor, I think that that

3    comes out of certain cases which really are not applicable

4    here; and I think if you look at the specific cases, the

5    court really found that they weren't in essence predictions

6    but really were facts.  So, to me, it's not a question of

7    legal doctrine -- I agree that that doctrine exists -- but I

8    think the application of it came up in the *Cummings* case,

9    for example, with the roofing material, so that a

10   manufacturer of a new type of plastic roofing material which

11   the manufacturer represented to the commercial purchaser

12   were designed to last 20 years, and the manufacturer in that

13   case said, "Well, that's just a prediction" or "That's just

14   an opinion," and the court said:  Well, not really.  It's

15   really a question of marketability, and there are certain

16   understood facts that are implied in that statement.  That's

17   just not a guess that it's going to last 20 years.  What

18   that really means, what that would be commonly understood to

19   mean by a company that was going to put this material on its

20   commercial buildings is that it was manufactured with

21   materials and in a way that has been tested and designed and

22   proven to typically last 20 years.  And so in that case,

23   your Honor states the principle correctly, and the court was

24   able to articulate what those implied facts were, or the

25   plaintiff was.  Here, I don't think the plaintiff has been

1    able to articulate any facts that underlie the claim.

2            The other point, your Honor, is that in that kind

3    of situation, the one with the roof, the conclusory

4    statement at issue is what you'd expect to be said in that

5    situation, and the facts are not ones that a reasonable

6    commercial purchaser would ask.  The commercial purchaser is

7    not going to say, "Give me the detailed chemical composition

8    of the material," because the purchaser wouldn't know what

9    to do with that information, or, "Give me the lab results so

10   I, as Cummings Property, can analyze whether the roof is

11   going to last 20 years."  There's no way the purchaser would

12   know.

13           In this case, when Loomis says, "We have

14   thoroughly reviewed the investment process, and it meets our

15   criterion and is appropriate strategy," and then the next

16   day Loomis gives Mr. Bhammer a PowerPoint which gets into

17   further details, and Mr. Bhammer who's an experienced

18   professional can ask himself what those details are.  He's

19   in the business too.  He knows how to ask exactly those

20   questions.  And in our brief, your Honor, we suggest certain

21   things that the company might have said that could have

22   theoretically been misrepresentations or things that

23   Mr. Bhammer could ask:  "Do you have seed money?  If so, how

24   much?  Have you signed a lease?  If so, for how long?  Can

25   you get out of the lease?  You hired Mr. McDonough and

1    Mr. Dorr in 2014.  That seems to be pretty good evidence

2    that you're committed to the fund.  But maybe they don't

3    really work for you after all, or maybe are you hiring other

4    people?"  There's lots of actual facts that we don't find

5    anywhere in the complaint that either happened, but

6    Mr. Bhammer is choosing not to tell us about them in the

7    complaint, or didn't.  But in either event, your Honor, what

8    we have is a complaint that has extremely generic conclusory

9    statements, mostly adjectives and adverbs.  If you took the

10   adjectives and adverbs out, you'd have nothing, and that

11   can't be the case.  You can't have a statement where if you

12   remove the adjectives and adverbs, you wouldn't even have a

13   representation at all, and that's really what we have here.

14   If you take out words like "thoroughly" and "committed" and

15   all that stuff, you don't have anything.  You just have

16   statements of optimism.

17           And, your Honor, again, it's important to

18   understand the context in which this arises, especially in a

19   state like Massachusetts which relies on an innovative

20   economy.  These kinds of comments are happening every single

21   day to investors and every single day to employees.  It

22   can't be the law of the Commonwealth that expressing

23   optimism about a fund and saying you're committed to a fund

24   is a misrepresentation.  There's simply not facts.

25           But the other piece, your Honor, which is equally

1    important is, there has to be an allegation that the facts

2    that were stated were false.  And we spend a lot of --

3    there's a lot of ink in the briefs about this, your Honor,

4    but I want to succinctly summarize it this way:  Take, for

5    example, the allegation that Loomis had thoroughly reviewed

6    the investment process.  Okay, nowhere in the complaint does

7    Mr. Bhammer allege that that's not true, okay.  That's the

8    primary allegation that they say is a fact.  And I suppose

9    that you might think in certain circumstances that it would

10   be.  So, for example, if you want to take the logic of the

11   roofing case to the extreme, you could say, well,

12   "thoroughly reviewed" means 100 hours a month, two months,

13   whatever.  You can make up something that Mr. Bhammer would

14   claim means that that means it was thoroughly reviewed as

15   opposed to some other kind of review.

16           You could also read the complaint to say:  Well,

17   of course they did that.  They hired Mr. McDonough in 2014.

18   He talked to Mr. Bhammer for six months in 2015 before they

19   decided to abandon the fund.  I don't know what Mr. McDonough

20   and Mr. Dorr were doing if they weren't doing the kinds of

21   things that would be consistent with that commitment, but,

22   in any event, nowhere does he say, "You were lying to me.

23   Mr. McDonough, even though he said that he was full time in

24   the Angleton Fund, really wasn't.  He really was launching

25   yet another fund and really didn't review it at all, let

1   alone thoroughly."  There's nothing like that anywhere in

2   the complaint.

3           I would challenge Mr. Hannon to tell us one

4   specific instance where there's an allegation of something

5   that could even remotely be considered a fact, and then show

6   us where in the complaint you say that fact is alleged not

7   to be true, because all we have is a conclusion at the end

8   that says, "Well, it turns out that you abandoned the fund

9   in July, and so it turns out that you weren't committed in

10  the long run because you abandoned the fund."  But those are

11  summaries, which presents its own problem, but forget that

12  they're summaries; they don't correspond to the factual

13  allegation.

14          So, for example, if the allegation was,

15  "Mr. Bhammer, we have $100 million in seed money," right, an

16  allegation that would suffice would say, "No, we didn't have

17  $100 million.  We had zero," or, "We had $25 million," or,

18  "There was a material condition on the seed money that we

19  didn't tell you about, and it turns out that condition

20  wasn't satisfied," or, "We had $100 million when we told you

21  in January, but then that was rescinded in March, and we

22  didn't tell you that till July."  That is, a situation where

23  there was a misleading disclosure based upon subsequent

24  events and arguably duty to disclose.  We don't have any of

25  those things because, number one, we don't have any fact

1 that would be susceptible to those things, but, number two,

2 we simply don't have an allegation in the complaint anywhere

3 where a specific fact that is alleged to be a

4 misrepresentation corresponds with an allegation that says

5 that that specific fact is not true.  And, your Honor, if we

6 don't have that, I don't know what we do have.  I don't know

7 what this trial would look like.  The essence of the claim

8 is that at some point Loomis realized that it was going to

9 abandon the fund and it didn't tell him soon enough.  That's

10 really the allegation.

11    Now, there's no allegation what that means, right,

12 because they don't say when we decided to abandon the fund

13 relative to when we told Mr. Bhammer.  For all we know, it

14 could have been 30 seconds later.  It could have been the

15 company decided to abandon the fund, and the very first

16 thing it did is got on the phone and said to Mr. Bhammer,

17 "Don't get on the plane.  We just decided to abandon the

18 fund."

19    And if it's not that, your Honor, then the

20 question is, tell me what this trial looks like.

21 "Mr. McDonough, when did you first have the slightest doubt,

22 based upon the volatility of the Chinese currency, that

23 maybe you weren't going to launch this fund?

24    "Well, I don't know.  I had a dream one night

25 where I was nervous about it in April."

1               And, you know, I can't imagine what that is

2       because ultimately, your Honor, you're not asking about

3       facts that you can prove to be false.  You're talking about

4       states of mind and an evolving situation.  This isn't:

5       These soles have been stored in a warehouse where they

6       degraded over the course of ten years, and now they don't

7       work in the shoes that they're being sold for.  This roof is

8       supposed to last 20 years, and it cracked after 11 years

9       because it wasn't manufactured in the way you claimed.

10      These are ultimately impossible things to know, your Honor.

11              THE COURT:  This is not really a 12(b)(6) issue,

12      or I don't think it is, but you would agree, would you not,

13      that because the defendant is this entity, a limited

14      partnership, that it's responsible for the knowledge and

15      statements of all of its agents?  So that if it were to turn

16      out that, for example, the people back in Boston were

17      thinking about or serious about shutting this thing down

18      14 days before they told Bhammer, and Bhammer, you know, the

19      irrevocable date or whatever it is where he can't go back to

20      his old job passes and they don't tell him that that's

21      attributable -- in other words, both McDonough's statements

22      and whoever is making this decision in Boston statements are

23      both the statements of Loomis Sayles; in other words, that

24      the entity, the corporate entity, the business entity is

25      responsible for all of those statements, all of those -- in

 1    other words, even if the left hand doesn't know what the

 2    right hand is doing, that doesn't get the company off the

 3    hook, right?  In other words, suppose there were a piece of

 4    paper -- I'll make it simple -- 30 days before Bhammer is

 5    told that says, "Let's shut this thing down," and nobody

 6    ever got around to telling anyone in the field, right, that

 7    would be, at least conceivably, under some circumstances

 8    actionable because you know this fact that it's about to be

 9    shut down, and yet you are representing to Bhammer that it's

10    still alive and that he should take detrimentally reliant

11    steps.

12              MR. BUCKING:  Your Honor, I think the answer to

13    your question is "yes," we're not claiming in this case

14    that, or at least for the purposes of this motion, that

15    something that McDonough said or Russell said or Marber said

16    or Dorr said, all the people who are named in the complaint

17    as having said various things, we're not claiming in any way

18    that they are not representatives of Loomis for these

19    purposes.  I mean, that is the claim of misrepresentation.

20    And I agree with you that if there were a duty to disclose,

21    then the fact that some part of the company knew and

22    McDonough, for example, didn't know, we're not claiming that

23    in this case.

24              But to me, your Honor, the thing that your example

25    highlights is what doesn't appear in the complaint:  this

1   notion that we knew 30 days in advance, we had made a

2   decision 30 days in advance and decided not to tell him.

3           THE COURT:  Is it a plausible allegation that the

4   decision was not made overnight and that it was under way

5   two days or eleven days or three weeks before Bhammer was

6   told?  Would that be a reasonable inference?

7           MR. BUCKING:  No.  Your Honor, I think what

8   that -- I want to separate out two things because this goes

9   to Count 2 really more than Count 2.

10          THE COURT:  Which is Count 2?  I'm sorry.

11          MR. BUCKING:  Count 2 is --

12          THE COURT:  Is that intentional interference?

13          MR. BUCKING:  Tortious nondisclosure.

14          THE COURT:  Tortious nondisclosure.

15          MR. BUCKING:  Right.  So I don't think any of that

16   saves Count 1.  But in Count 2, the question would be, is

17   there some fact that we have a duty to disclose that we

18   didn't disclose, okay?  And so in the scenario you gave, the

19   company makes a decision to abandon the fund and decides to

20   sit on it for 30 days.  To the extent that the company

21   previously told him it intended to launch the fund, at the

22   point at which it had decided not to launch the fund,

23   there's arguably a duty to disclose that because not doing

24   so would contradict something that had occurred previously.

25          I think you asked a slightly different question, I

 1    assume intentionally, which is, is there a duty to disclose

 2    the nanosecond that anyone in the entire company begins to

 3    have less confidence than he or she had previously?  And the

 4    answer to that has to be "no."  Just even asking the

 5    question seems absurd.  How does that trial proceed?

 6              THE COURT:  I guess, but surely there's something

 7    about this that's troublesome -- of course, I just have the

 8    complaint -- I don't really know what happened here -- that

 9    if there's a serious issue that, you know, maybe this thing

10    is not going to get off the ground, and meanwhile this guy

11    in Hong Kong with a young family, whose residency in

12    Hong Kong depends on him holding a job, is being hung out to

13    dry, and would they have a duty, for example, to say, "Hold

14    on a second.  Don't resign your job just yet, you know, till

15    you hear from us," you know, if they knew that this thing

16    was seriously being considered or they were seriously

17    considering shutting it down?

18              MR. BUCKING:  Your Honor, that's a very

19    interesting question.  There's nothing in the complaint that

20    makes us have to answer that question because there's no

21    allegation that we did in fact know something sooner that we

22    didn't tell him.  He's just assuming that, "Gee, you must

23    have.  It's not possible that you could have told me as soon

24    as you found out," when in fact of course it's possible that

25    we told him as soon as we found out.

1           But, your Honor, I think that here's the other

2    thing you don't see in the complaint:  You don't see a

3    breach of contract claim.  And so we can sit here and

4    speculate about what we might see if we saw a breach of

5    contract claim.  Maybe he has an employment agreement.

6    Maybe he had an offer letter that spelled out what happens

7    in the event that the discussion falls apart.  A

8    sophisticated prospective employee can be expected to

9    negotiate a signing bonus, severance agreement, employment

10   agreement, any number of things to protect against this; and

11   this Court has no way of knowing what, if anything,

12   Mr. Bhammer negotiated for, or what he asked for and Loomis

13   said "no" to, because Loomis might have said, "It's a

14   volatile fund.  We're pretty confident about it, but we're

15   not going to commit financially till it's launched."  We

16   don't know any of those things.

17           And so ultimately, your Honor, it is a troubling

18   situation.  It's troubling for Loomis.  We said this in our

19   papers and it's true:  It's an unfortunate situation.  And

20   Mr. Bhammer and others were, you know, were on the wrong

21   side of that, which unfortunately happens with a lot of

22   nascent funds and other nascent businesses.

23           I don't think that that -- the fact that a breach

24   of contract action may not be the most advantageous way for

25   the plaintiff to plead this case does not make a

1   misrepresentation out of something that's not a

2   misrepresentation, and ultimately what we have to do is look

3   at what the claims are of misrepresentation:  Are they facts

4   that are susceptible to being proven true or not true?

5   Because that's ultimately what happens at trial.  Is there a

6   factual statement that turned out not to be true or that

7   wasn't true at the time?  And you ought to be able to look

8   at those things and decide.  And I can't see how you could

9   look at any of the specific claims in this case and say,

10  yes, we can decide when McDonough said "We're committed to

11  the fund" or "We're taking it slowly and cautiously" or

12  "We've thoroughly reviewed it," what that trial looks like;

13  again, with the exception that if they want to claim, which

14  they haven't, that they didn't really thoroughly review it,

15  that they said they spent a hundred hours and they spent two

16  hours.  But the rest of those things, if you look at them, I

17  think it's impossible, it would be impossible to have a

18  trial to prove or disprove those things.  And, in any case,

19  there is no claim that any specific thing is false, so what

20  we're really saying is, "Boy, this is a pretty unfortunate

21  situation.  Something must have gone wrong.  They must have

22  known sooner than they said," and there's simply nothing in

23  the complaint that would cause you to reasonably believe

24  that.  You have sophisticated actors on both sides.  You had

25  a six-month courtship, and during that time, there are

1    conversations that are described in the complaint, there are

2    PowerPoints described in the complaint, there's other papers

3    that are either alluded to or you can infer in the

4    complaint.  We don't know anything about any of those

5    details.  We just know the conclusions, we just know the

6    headlines, and, your Honor, I submit that that's an

7    impossibility for this Court to try.

8              And I also suggest the Court -- obviously, we

9    extensively briefed this -- there are a couple of cases that

10   we think are really directly on point.  Judge Woodlock's

11   decision in *NPS* is almost exactly like the allegations in

12   this case, the claim there that there is this time-tested

13   model of stringent underwriting practices, and the Court

14   said, "No.  That's just not specific enough to warrant a

15   misrepresentation claim."

16             Your Honor, may I just make two other points on

17   Counts 2 and 3?

18             THE COURT:  Yes.

19             MR. BUCKING:  We already spoke about Count 2

20   quickly.  Both counts should be dismissed for the same

21   reason Count 1 should be dismissed, but, in addition, there

22   are a couple of extra points.  On Count 2, if you look at

23   the cases, your Honor, in each and every case there are

24   special facts that justify a duty to disclose.  For example,

25   in the *First Marblehead* case, the company put out paperwork

1    saying employees had ten years to exercise options when they

2    really had three months, and so the Court said, "There you

3    have a duty to disclose because you said something that was

4    contradictory."  In the *Zipcar* case, Judge Saris said there

5    was no duty to disclose, there was no special duty in the

6    employment context.  And there is no facts in this case that

7    either suggest there's a special duty to disclose or that

8    something specific was said that needed to be corrected,

9    like in the example I gave with the seed money.

10           And then, finally, the tortious interference

11   claim, your Honor, most of what we did in the brief I think

12   focused on the question of whether, if Loomis is the one

13   who's tortiously interfering with a contract between

14   Mr. Bhammer and Macquarie, does Loomis's interference have

15   to be directed toward Macquarie, or can it be directed

16   toward Mr. Bhammer?  Okay, that's mostly what we talked

17   about in the brief.  And I submit to you that we're right on

18   that point, that if you really look at the case law, the

19   interference is and has to be directed at the third party

20   rather than the plaintiff.

21           But in this case, I think there's a more

22   fundamental flaw, which is, the interference has to be

23   relevant in some fashion to the third party, and here's what

24   I mean by that:  Let's say Loomis in an attempt to free up

25   Mr. Bhammer went to Macquarie and said, "I heard that

1    Mr. Bhammer --" and just fill in the blank, just some

2    horrible thing, committed a crime, did whatever, okay.  So

3    there you have a direct contact with the third party, which

4    we say you need to have, okay.  But aside from that it's

5    with the third party, there's actually conduct that's

6    relevant to that relationship because you're attempting to

7    interfere with their employment, as opposed to here where

8    everything Loomis did was directed at Mr. Bhammer.

9            To take the flip side of that, assuming the law

10   allowed the interference to happen vis-a-vis Mr. Bhammer

11   rather than vis-a-vis Macquarie, it could theoretically be

12   something like saying to Mr. Bhammer something terrible

13   about Macquarie:  They're about to be indicted or the

14   company is going to go bankrupt, or just some bad statement.

15   But in each of those cases, whether Loomis is speaking to

16   Macquarie or speaking to Mr. Bhammer, the thing that's being

17   said is relevant to the contractual relationship between the

18   two of them.  The problem here is that everything Loomis

19   said -- look at the complaint -- everything that Loomis said

20   that Mr. Bhammer is complaining about had purely to do with

21   the potential opportunity at Loomis and had nothing to do

22   with Macquarie at all.  The interference is secondary or

23   tertiary.  The interference claim is that, in essence, he

24   had to leave Macquarie to go to Loomis and Loomis was trying

25   to lure him, but there's no claim that there was any actual

1    interference or that Loomis cared one way or the other

2    whether he was working with Macquarie.  He could have been

3    working anywhere.  He could have not been working at all.

4    He could have said, "I'm going to reenroll in school and go

5    to Oxford, and that's what I would have done, but then you

6    lured me to come work for you," or, "I was going to go on an

7    African safari with my family, and you interfered by luring

8    me to your job."  The thing he was being lured away from is

9    irrelevant, and I submit to the Court that for there to be a

10   tortious interference claim, it has to be relevant.  There

11   has to be some manner in which Loomis is alleged to have

12   actually interfered in that contract, as opposed to simply

13   trying to lure him to employment.  That alone is not enough.

14        Thank you.

15        THE COURT:  All right, thank you.  All right,

16   Mr. Hannon.

17        MR. HANNON:  Yes, your Honor.  Let me just start

18   on that last part regarding Count 3, the tortious

19   interference claim; and, as we write in our briefs, we think

20   Mr. Bucking is flat out wrong regarding whether or not the

21   interference or tortious interference needs to be with the

22   third party or with the person themselves.  And the Mass.

23   SJC addressed this directly in *Shafir v. Steele*.  We cite

24   that in our brief.  It's 431 Mass. 365.  And the SJC there

25   adopted Section 766-A of the Restatement of Torts and made

1   clear that Massachusetts, along with the majority of common

2   law jurisdictions, was going to be following this particular

3   type of tortious interference.  So with respect to

4   Mr. Bucking's claim that the interference has to be with

5   some third party, that's just not true.

6          Now, with respect to what the interference has to

7   entail, Mr. Bucking suggests that there needs to be some

8   kind of connection with the third party or some sort of

9   intent, and I would submit that's fundamentally wrong as

10  well.  Note we're talking about a tort, and really the basis

11  of the tort is the knowledge of the existence of the

12  relationship.  And when you have knowledge of the existence

13  of a relationship, and through improper means or motive you

14  interfere with that relationship, at the end of the day, it

15  doesn't matter why you're interfering, it doesn't matter how

16  you're interfering; the fact is that you have knowledge of

17  the risk of harm to the party, and you engage in improper

18  conduct that causes that harm, and that tort then lies, and

19  that's exactly what happened in this case.

20         With respect to the misrepresentation and

21  nondisclosure claims, just to sort of take a step back here

22  regarding the factual record, and I think part of the

23  factual record that Mr. Bucking didn't focus on is what we

24  allege that Loomis knew during what he's described here as

25  this courtship.  And the complaint alleges that Loomis knew,

1    before this courtship even began, that Mr. Bhammer had this

2    employment relationship in Hong Kong; that he was going to

3    need to move his family, his young family, in order to take

4    Loomis's proposed job opportunity.  Loomis knew that before

5    they began recruiting him.  That was also something that he

6    reinforced during this courtship period.  As we allege,

7    there was a specific conversation with Mr. Russell from

8    Loomis in which Mr. Bhammer specifically inquired about

9    Loomis's commitment to make sure that they were actually

10   aware of the market they were getting involved in, that they

11   were aware of the risks posed by the market, and that they

12   were truly involved in this for the long haul.  In short,

13   Mr. Bhammer, he communicated to Loomis throughout that this

14   was an issue that he was specifically focused on.

15           And he did this again when he accepted the offer.

16   As we also allege, after he accepted the offer but before he

17   resigned from his existing employment, he told Loomis,

18   "Listen, I'm not going to give notice of resignation until

19   you can confirm for me that we're all set."  And in

20   particular, there was an issue with respect to the approval

21   of his background check.  So Loomis knew that Mr. Bhammer

22   had this existing relationship and that he was not going to

23   surrender this existing relationship unless the

24   representations they had made regarding their commitment to

25   the fund were and remained true at the time he gave his

1     notice.

2            So to answer Mr. Bucking's question regarding what

3     is it that we allege that Loomis misrepresented, and for all

4     of the characterizations that Loomis made, both today and

5     also in their papers, they really don't spend an awful lot

6     of time talking about the actual representations that we

7     allege.  They spend a lot of time characterizing them,

8     saying what they aren't, but they really don't spend a lot

9     of time talking about what they are.

10           And in terms of what these allegations are, we've

11    provided a chart on Page 7 of our opposition brief to walk

12    through sort of the primary representations that we've

13    alleged.  And there's sort of a common theme in these

14    representations, and the common theme is important for one

15    reason, which is that the law is clear that representations

16    are not just explicit; they're also implicit.  So in

17    considering whether or not Mr. Bhammer has alleged an

18    actionable misrepresentation here, the Court should not

19    focus merely upon what he alleges was represented but also

20    what plausibly could be inferred as a representation from

21    them.  And if you look at all of the representations as a

22    whole, there was a common theme, and the common theme here

23    was that Loomis had done its homework, that they had looked

24    at this fund, that they had already looked at the processes,

25    the strategy involved, they looked at the market; they'd

1    done all of their homework on the fund, and they'd already

2    made up their mind.  That was their allegation to

3    Mr. Bhammer:  "We've done the homework.  We've made up our

4    mind, and we're ready and committed to doing this thing."

5              It's also important to recognize that they also

6    made representations, to your Honor's point earlier about

7    the case law regarding opinions and whether or not opinions

8    are actionable, and, as you note, the case law is clear that

9    when you render an opinion, you're not just saying your

10   opinion is true, that you truly believe it; you're also in

11   some cases representing that the facts underlying the

12   opinion are true.  And Mr. Bucking would have the Court

13   believe that Loomis doesn't operate its business based upon

14   facts, that Loomis simply operates its business based upon

15   feelings and conjecture and all of that, and I would submit

16   that common sense suggests that that's not true; that at the

17   end of the day, regardless of what they're saying about what

18   they've reviewed or whether or not they've been thorough,

19   that Loomis operates its business based upon facts, based

20   upon facts that it gathers, based upon facts that it

21   analyzed, and has represented to Mr. Bhammer throughout this

22   process that those facts, that the facts within Loomis's

23   control and possession and knowledge, that those facts

24   supported this decision to launch this fund.  And I would

25   submit that the facts alleged in the complaint plausibly

1  suggest that Loomis represented to Mr. Bhammer that there

2  were no facts known to Loomis that were contrary to that

3  decision, that Loomis at no time prior to its disclosure of

4  abandoning the fund, that Loomis kept on representing, "Yes,

5  we've done our homework.  We're sure we're doing this.

6  We're not aware of any facts that might cause us to decide

7  to abandon it."

8         So were those representations true?  And as your

9  Honor pointed out in response to Mr. Bucking's question

10  about, you know, where are these specific allegations as to

11  what specific fact is true or untrue, in assessing the

12  sufficiency of the complaint, the question is ultimately

13  whether or not the well-pleaded factual allegations

14  plausibly support the inferences that we need the Court to

15  draw; and we would suggest that the facts here plausibly

16  support the inference that each of the representations we've

17  identified were false.  D there are three things in

18  particular, three facts in particular that we allege that we

19  think are important.  The first has to do with the timing.

20         Now, Mr. Bucking when he spoke a few minutes ago,

21  he tried to paint a picture where there was a six-month gap,

22  right?  He focused on that first January conversation for a

23  reason, because timing here matters a lot.  If it's a

24  six-month gap between the time that these representations

25  are made and Loomis decides to shut down the fund, that's a

1    very different case than what we have here because the case

2    we have here is a three-week gap.  The case we have here is

3    that Loomis is continuing to make representations to

4    Mr. Bhammer concerning the fund, concerning the fact that

5    everything is on track, that he's starting his employment

6    soon.  They're making all those representations all the way

7    up through June.  So we're looking at just a three-week gap

8    from when Loomis is representing that all things are a go

9    and Loomis suddenly announces that they're not.

10           And the other important fact here as well is the

11   explanation that Loomis provides when they announce to

12   Mr. Bhammer that they're shutting this fund.  Mr. Bucking,

13   he described this as an inherently volatile business, and I

14   would submit the reason for that is to suggest that, you

15   know, jeez, maybe something changed here, maybe some of the

16   underlying facts that went into Loomis's decision here

17   changed; but if you look at Loomis's explanation for why

18   they decided to abandon the fund, that's not what they

19   claimed.  They didn't claim that there had been some sort of

20   shake-up in management or something else unforeseen that

21   caused them to suddenly change their mind.  What they

22   pointed to was really just two reasons:  One, they said that

23   they didn't have the systems, which I would submit was in

24   direct contradiction to their prior statements regarding

25   that they had already looked at everything and done their

1    homework.  And the other was that they simply decided they

2    didn't like the strategy.  Loomis said nothing about any

3    sort of volatility or changes that had happened in that

4    three-week period that led them to abandon the fund.  And I

5    would submit that the lack of any such reasons and the

6    reasons that were given, those are part of the

7    circumstantial case here, your Honor, that plausibly support

8    the inference that in fact the representations that had been

9    made to Mr. Bhammer throughout his courtship simply weren't

10   true.

11          On the question of whether or not the claims are

12   actionable, with respect to the misrepresentation claim, I

13   think Mr. Bucking focused a great deal on the shoe case, but

14   there are a number of cases in Massachusetts -- we've cited

15   several of them -- that deal with different kinds of

16   representations, not all of which have the same factual

17   flavor that Mr. Bucking suggests is necessary.  And I would

18   submit that the case law in Massachusetts is clear that

19   trying to determine what is a fact versus what is an opinion

20   really is in and of itself a factual question.

21          Mr. Bucking posed the question several times, what

22   does this trial look like?  And the honest answer is, we

23   don't know.  We're not there yet.  The question before the

24   Court is not what the trial in this case will look like.

25   The question is simply, have we alleged sufficient facts to

1   plausibly suggest that if we engage in discovery, that we'll

2   be able to support our claims?  And we would submit that we

3   have.

4        With respect to the issue about tortious

5   nondisclosure, I believe your Honor asked the question,

6   don't the facts plausibly suggest that Loomis knew sometime

7   in advance of two or three weeks that they were going to

8   shutter the fund?  And we would submit that the facts do

9   support that inference; that common sense, which the First

10  Circuit says is part of your Honor's decision of whether or

11  not the allegations are enough, common sense would plausibly

12  suggest that this wasn't a decision that was made overnight.

13  It would plausibly suggest that given the fact that this was

14  a fund that Loomis had spent months in gearing up, a fund

15  that Loomis had itself characterized as proceeding carefully

16  and thoroughly, that the Loomis representatives simply did

17  not just wake up one morning and decide, "You know, the

18  thing we're working on for six months, let's just not do

19  that," and that in fact that there was some significant

20  period of time during which that was deliberated.

21        And I would also argue that the facts plausibly

22  suggest that that decision was made based upon information,

23  was made based upon facts that Loomis had, either they had

24  at the time they were making these representations to

25  Mr. Bhammer or that they acquired subsequent to that caused

1    them to in some way, you know, change their decision.  What

2    we know is that something happened, something happened

3    between January, and we know that something happened prior

4    to this ultimate decision to shutter the fund, and that was

5    never disclosed to Mr. Bhammer.  And for the reasons your

6    Honor pointed out in terms of what Loomis knew about the

7    significance of this decision, in light of all the

8    representations that Loomis had made regarding the

9    commitment of the firm to the fund, for all of those

10   reasons, Loomis did have a duty.

11            And I would also say that in response to

12   Mr. Bucking's question about how do you as a factual matter

13   decide when should that disclosure take place or what rises

14   to the level of requiring that disclosure, that's a jury

15   question.  Those are the kinds of issues that juries

16   struggle with every day based upon the facts and

17   circumstances and based upon the law as they're instructed.

18   And in this instance, the law is clear that under

19   circumstances such as this, where Loomis has made affirmative

20   representations regarding its commitment, regarding the

21   thoroughness of its decision-making, where Mr. Bhammer has

22   specifically inquired regarding their commitment to make

23   sure that in fact there were no contrary facts out there,

24   then in those circumstances, they have the duty; and the

25   question for a jury in this case ultimately will be, did

1    Loomis fulfill that duty?  And, again, for the reasons

2    stated and everything in our papers, we would submit that

3    the facts alleged here do plausibly support the inferences

4    that we need in order to get over the 12(b)(6) hurdle, and

5    we would ask that the Court deny the motion to dismiss.

6              THE COURT:  This is obviously beyond the

7    pleadings, but why is there no either breach of contract

8    claim or a breach of quasi contract, detrimental reliance,

9    promissory estoppel?

10             MR. HANNON:  Not the remedy we're looking for.

11   We're not looking to enforce the terms of the employment

12   agreement with Loomis.  And in fact his prior employment

13   arrangement was actually more lucrative on at least sort of

14   a baseline, so for that reason, we're not seeking to enforce

15   that agreement.

16             THE COURT:  All right, so it's strictly tort

17   claims?

18             MR. HANNON:  That's correct, your Honor.

19             THE COURT:  All right, any quick response?

20             MR. BUCKING:  Your Honor, yes, just very briefly.

21   I appreciate Mr. Hannon's honesty in response to that

22   question, which is that what Mr. Bhammer negotiated for,

23   when he knew he was getting into an unlaunched hedge fund in

24   Asia, wasn't good enough, and so he's asserting tort claims,

25   when he had the capacity and the professional ability and

1    the experience to negotiate for how he should be treated in

2    precisely this situation.  I think that speaks volumes about

3    this complaint.

4              THE COURT:  Well, it's all outside the pleadings.

5    It just struck me reading this that if there wasn't a

6    contract, you know, why isn't there a promissory estoppel

7    claim?  But --

8              MR. BUCKING:  Right, your Honor.  It goes to

9    context, which the cases all instruct is something that we

10   need to look at in assessing the circumstances here, and

11   we're dealing with an inherently volatile situation.  I come

12   back to the innovation economy that Massachusetts lives or

13   dies on, and this notion that --

14             THE COURT:  Or Singapore, as the case may be.

15             MR. BUCKING:  -- this notion that somehow Loomis

16   owed Mr. Bhammer a minute-by-minute or perhaps

17   second-by-second update on any fact or any thought that

18   anybody in the company might have had that called into

19   question whether the fund was going to launch simply can't

20   be the case.  There's no case law anywhere that suggests

21   that that's the law.  I think that's the crux of this.  And

22   what this comes down to is, Mr. Hannon says, "Well, it's not

23   January to July.  It's really three weeks."  You know, maybe

24   it's from that second PowerPoint that he got in June until

25   July when, you know, as time goes on, there's no question

1       that there are a series of conversations, as alleged in the

2       complaint, that essentially confirm that, "Yeah, we've

3       looked at it again, and things still seem to be on track."

4              And what the complaint stands for is that things

5       were on track until they weren't on track, right?  That has

6       to by definition be the case.  There's no claim that anyone

7       was deliberately lying in January and February and March and

8       April, at least no specific claim.  Mr. Hannon says, well,

9       there's no -- Loomis didn't say, or at least the allegations

10      that he puts in the complaint don't say, that anything had

11      changed; but the inherent nature of the enterprise was

12      volatile where until it launched, of course it's a question

13      of whether it launches, just like every start-up business

14      anywhere who's seeking investors or seeking employees, until

15      it happens, and even after it happens, it can go bust.

16      That's the nature of the enterprise.

17             And, again, this notion that either that there's

18      an allegation that says, "We knew on June 10 but we didn't

19      tell him until July 16," there is no such thing, we're just

20      guessing.  And what it reduces to is, well, you couldn't

21      have begun thinking about it the second you decided.  I

22      suppose that's true, right?  I mean, I suppose, even if

23      there was a half-hour meeting, you might have been talking

24      about it at the beginning of the meeting and didn't tell

25      him till the -- you know, and then as soon as the meeting

1    ends, we run and we call him and say it's over.  But then

2    the claim would be, well, you should have told him the

3    second the meeting started.  The same holds true in this if

4    you take it to a week or a day.  The second anybody has the

5    slightest factual input, the second anyone has the slightest

6    doubt that maybe it's not as good in July as it was in June,

7    or not as good in June as it was in May, that somehow

8    there's a duty to run to Mr. Bhammer and say, "Hold on.  One

9    of the people involved in the discussions is questioning

10   this month's numbers, and, you know, you'd better not move

11   forward."  There's nothing in any case that suggests that

12   that supports a misrepresentation claim.

13              Thank you, your Honor.

14              MR. HANNON:  Your Honor, if I could briefly

15   respond to that?

16              THE COURT:  Yes.

17              MR. HANNON:  There's nothing in any case to

18   suggest that doesn't support a misrepresentation claim, and,

19   as I mentioned a moment ago, I think the ultimate question

20   that Mr. Bucking is asking is, you know, where do we draw

21   the line between when the duty of disclosure arises?  And

22   that is a factual question, and the only question for this

23   Court in assessing the sufficiency of the complaint is, have

24   we plausibly suggested that that duty of disclosure arose at

25   a point in time where it caused Mr. Bhammer harm?  And again

1    we suggest that the facts here do plausibly suggest that the

2    duty of disclosure arose sometime before the middle of June.

3    It arose at a point in time where Mr. Bhammer had the

4    ability to tell his former employer, "Hang on.  I'm going to

5    keep this job."  And that's enough to get over a motion to

6    dismiss.  It might not get us to a trial at this point,

7    Judge, but that's not what we're asking for.  We're just

8    asking to get past the 12(b)(6) stage.

9         And then there's one last thing I would say is

10   that just for the record, to the extent your Honor does

11   discern any deficiencies in our complaint, we would ask for

12   leave to amend to correct whatever the deficiencies, if any,

13   your Honor discerns.

14        THE COURT:  Well, on that latter point, you know,

15   the way this works is, you can seek to amend your complaint

16   in response to a 12(b)(6) motion, but it really isn't

17   supposed to work.  You wait until I rule, and then if I rule

18   against you, you get to amend your complaint.  It's, you

19   know -- anyway, it's not the way it's supposed to work, but

20   we'll cross that bridge when we get to it.

21        All right, I'm going to take this under

22   advisement.  Thank you.  It was well argued on both sides.

23   And, Mr. Hannon, don't forget my jurisdictional issue, and

24   thank you.

25        MR. HANNON:  Thank you.

1                    THE CLERK:  All rise.

2                    (Adjourned, 2:54 p.m.)

1                    C E R T I F I C A T E

2


3

UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5


6


7            I, Lee A. Marzilli, Official Federal Court

8  Reporter, do hereby certify that the foregoing transcript,

9  Pages 1 through 38 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in Civil

11  Action No. 15-14213-FDS, Vishal Bhammer v. Loomis, Sales &

12  Company, L.P., and thereafter by me reduced to typewriting

13  and is a true and accurate record of the proceedings.

14            Dated this 27th day of June, 2016.

15

16

17

18

19            /s/ Lee A. Marzilli
                _____
20            LEE A. MARZILLI, CRR
              OFFICIAL COURT REPORTER
21

22

23

24

25