**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VISHAL BHAMMER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LOOMIS, SAYLES & COMPANY, INC., )<br>)<br>Defendant. )<br>) | Civil Action No.<br>15-14213-FDS |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

SAYLOR, J.

This is a dispute arising out of a rescinded employment offer. Jurisdiction is based on diversity of citizenship. Plaintiff Vishal Bhammer has brought suit against defendant Loomis, Sayles & Company, Inc., alleging claims for misrepresentation, tortious nondisclosure, and tortious interference.

Loomis has moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted. For the following reasons, the motion to dismiss will be denied.

**I.  Background**

    **A.  Factual Background**

Defendant Loomis, Sayles & Company, Inc. is a business corporation incorporated in Massachusetts that serves as the general partner of Loomis, Sayles & Company, L.P., an international investment firm (collectively, "Loomis"). (Am. Compl. ¶ 6). In 2014, Loomis

began preparations for the launch of a new hedge fund that it referred to as "Angleton Capital" (the "Angleton Fund"). (*Id.* ¶ 7). Loomis envisioned that the Angleton Fund would "have a heavy presence in Singapore," and would focus its investment "primarily in the Asian-Pacific markets." (*Id.* ¶ 8). Loomis hired a money manager named Michael McDonough to lead the fund and serve as its Chief Investment Officer. (*Id.* ¶¶ 9-10).

In January 2015, Loomis began recruiting plaintiff Vishal Bhammer to join the Angleton Fund. (*Id.* ¶ 11). At that time, Bhammer was employed by Macquarie, a global financial services firm located in Hong Kong, where Bhammer lived with his family. (*Id.*). The complaint alleges that Bhammer's recruitment was led by McDonough, and that Loomis was aware that he lived in Hong Kong with his wife and his two young children. (*Id.* ¶ 13). According to the complaint, "Loomis Sayles sought to convince [Bhammer] that the Angleton Fund presented an employment opportunity that warranted resigning from his position with Macquarie and relocating his family to Singapore." (*Id.* ¶ 14).

Bhammer's recruitment began with a Skype conference on January 28, 2015. (*Id.* ¶ 16). The complaint alleges that during that conference, McDonough "represented to [Bhammer] that the Angleton Fund had an appropriate and well-defined investment process, strategy, and philosophy." (*Id.*). Shortly thereafter, "McDonough provided [Bhammer] a PowerPoint presentation that confirmed and elaborated on the investment process, strategy, and philosophy that McDonough had described." (*Id.* ¶ 18).

On February 6, 2015, Bhammer participated in a second Skype call, this time with Peter Marber, Loomis's Head of Emerging Markets Investments and the putative CEO of the Angleton Fund. (*Id.* ¶¶ 10, 20). Marber "confirmed the representations that had been made by McDonough," and represented that Loomis Sayles "was committed to providing the Angleton

Fund with the time and resources needed for success." (*Id.*).

On March 26, 2015, Bhammer met with McDonough in Hong Kong. (*Id.* ¶ 22). The complaint alleges that McDonough told him that the fund was "progressing in accordance with the investment process, strategy and philosophy that they had discussed in January." (*Id.*). "McDonough further represented that Loomis Sayles was proceeding slowly and carefully with the Angleton Fund to ensure its successful launch." (*Id.*). On March 31, 2015, Bhammer met with Jeff Dorr, another analyst who had been recently hired by Loomis to work on the Angleton Fund. (*Id.* ¶ 23). According to the complaint, Dorr also confirmed that Loomis was proceeding "slowly and carefully" to ensure the successful launch of the fund. (*Id.*).

On April 15, 2015, Bhammer met again with Marber; the complaint alleges that, as in previous meetings, Marber represented that the fund was "progressing in accordance with the investment process, strategy and philosophy" that had been shown to Bhammer in January, and that Loomis continued to proceed "slowly and carefully" towards the Angleton Fund launch. (*Id.* ¶ 24). Two days later, on April 17, Bhammer participated in a phone conference with John Russell, Senior Counsel and Head of Human Resources for Loomis. (*Id.* ¶ 25). The complaint alleges that Bhammer stated his belief that success in the Asian-Pacific market required "commitment over a long period of time" and asked Russell if Loomis was committed to the fund for the long-term. (*Id.*). Russell "represented that Loomis Sayles was familiar with the challenges posed by the Asian-Pacific market," and that Loomis was making a long-term commitment with the Angleton Fund. (*Id.*).

On May 1, 2015, Bhammer accepted an offer from Loomis to join the Angleton Fund as a Senior Analyst. (*Id.* ¶ 26). On May 13, 2015, Bhammer informed Loomis's human resources department that he would delay giving notice to Macquarie until his background check was

completed.  (*Id.* ¶ 27).  On June 2 and 3, 2015, Loomis informed Bhammer that his background check was complete, "that there was no reason for [Bhammer] to delay giving notice of his resignation to Macquarie," and that he "should do so as a soon as possible."  (*Id.*).  The complaint alleges Bhammer gave his resignation to Macquarie on June 3, 2015, in reliance on those representations.  (*Id.* ¶ 29).

On June 6, 2015, Russell told Bhammer there was "no reason" to delay taking any of the actions necessary to prepare for relocating his family to Singapore.  (*Id.* ¶ 31).  Between that date and July 5, 2015, the complaint alleges that Loomis "continuously represented to [Bhammer] that its prior representations concerning the Angleton Fund remained true and accurate, and that Loomis Sayles was unaware of any facts that would raise doubt as to the truth" of those representations.  (*Id.* ¶ 32).  For example, on June 9, McDonough e-mailed Bhammer to confirm that his employment would begin on July 20, 2015.  (*Id.* ¶ 33).  On June 11, McDonough provided a second PowerPoint presentation, which the complaint alleges confirmed that "the Angleton Fund was pursuing the same investment process, strategy and philosophy that had been discussed in January."  (*Id.*).  On June 24, Ivy Koch, a Loomis Vice President, e-mailed Bhammer to confirm that he would be required to be in Boston from July 27, 2015 through the first week of September, and "further advised [Bhammer] that '[t]here is not a need for you to extend your current lease' in Hong Kong."  (*Id.*).

Bhammer's resignation from Macquarie became effective on July 5, 2015.  (*Id.* ¶ 34).  On July 16, 2015, however, Loomis "suddenly disclosed to [Bhammer] that it had decided to abandon the Angleton Fund and, consequently, that [his] job no longer existed."  (*Id.* ¶ 35).  The complaint alleges that Loomis gave two reasons for its decision.  First, Loomis claimed it "lacked the necessary systems to execute the Angleton Fund's strategy."  (*Id.*).  Second, Loomis

stated that it "did not otherwise approve of the Angleton Fund's strategy." (*Id.*). The complaint further alleges that, approximately one month later, Loomis gave Bhammer a written explanation:

> [A] recent assessment of the fund's investment process, philosophy and performance led the CIO and others to conclude that the fund could not succeed without significant investments of time and resources to refine and develop the strategy to match Loomis Sayles' expectations. Loomis management assessed these factors and determined that the likelihood of Angleton successfully creating a differentiated product that met the firm's risk/return standards and attracted a reasonable asset base was too low.

(*Id.* ¶ 36).

The complaint alleges that prior to July 16, 2015, when Loomis informed Bhammer that his job no longer existed, at no time had Loomis "disclose[d] to [Bhammer] that the Angleton Fund lacked an appropriate and well-defined investment process, strategy and philosophy." (*Id.* ¶ 37). Further, the complaint alleges that Loomis never informed Bhammer that it "was considering abandoning the Angleton Fund," that it "was aware of facts that might cause Loomis Sayles to consider abandoning the Angleton Fund," or that it was "aware of facts that would raise a doubt as to whether [Bhammer] should resign from Macquarie or otherwise take action in preparation for his promised employment with Loomis Sayles." (*Id.* ¶¶ 38-40).

### B. Procedural Background

Bhammer filed an original complaint in this action on December 23, 2015. The complaint alleges claims for (1) misrepresentation, (2) tortious nondisclosure, and (3) tortious interference. On February 9, 2016, Loomis filed a motion to dismiss all counts pursuant to Rule 12(b)(6). On June 22, 2016, Bhammer filed an assented-to amended complaint for the limited purpose of clarifying the proper defendant in this action and the Court's basis for subject-matter

jurisdiction. Because the amended complaint made no other substantive changes, the Court deemed Loomis's motion to dismiss renewed.

## II. Legal Standard

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the facts as alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations omitted) (internal quotation marks omitted).

## III. Misrepresentation (Count One)

Count One of the complaint alleges a claim for "misrepresentation." Loomis offers three contentions in favor of dismissal: that the complaint fails to meet the requirement for pleading fraud with particularity of Fed. R. Civ. P. 9(b); that the complaint fails to allege actionable statements of fact; and that the complaint fails to allege that the statements were false when made, or that Loomis knew they were false when made. Bhammer asserts in his briefing that Count One brings a claim for both intentional and negligent misrepresentation.

A.     **Intentional Misrepresentation**

To establish intentional (or fraudulent) misrepresentation, Bhammer must show that Loomis "[1] 'made a false representation of a material fact [2] with knowledge of its falsity [3] for the purpose of inducing [him] to act thereon, and [4] that [he] reasonably relied upon the representation as true and acted upon it [5] to his damage." *Eureka Broadband Corp. v. Wentworth Leasing Corp.*, 400 F.3d 62, 68 (1st Cir. 2005) (quoting *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 (2002)).

Under Fed. R. Civ. P. 9(b), for claims "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b) requires that a complaint to state the time, place, and content of the alleged false or fraudulent representations to state a claim for fraud. *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996).

Loomis contends that Bhammer has not met the Rule 9(b) standard because the complaint fails to allege with specificity the content of the alleged misrepresentations involved. That argument, however, can be quickly rejected. Among other things, for example, the complaint alleges that Loomis, through its various agents, represented to Bhammer that the Angleton Fund had "an appropriate and well-defined investment process, strategy and philosophy," Am. Compl. ¶ 16, that Loomis had "reviewed" that process, strategy, and philosophy, *id.* ¶ 17, and that the fund "met the criterion used by Loomis Sayles in determining whether to launch a new fund." *Id.* The complaint further alleges that Loomis told Bhammer it was "committed" to the fund, *id.* ¶ 20, and that it was proceeding "slowly and carefully" with the fund to ensure its success, *id.* ¶ 22. Finally, the complaint alleges that Loomis told Bhammer that there was "no reason" for him to delay in taking steps to leave his job with Macquarie and move his family to Singapore.

7

*Id.* ¶¶ 28, 31. Those allegations provide the relevant content of the alleged misrepresentations and are sufficient to meet the particularity requirements of Rule 9(b).

Loomis next contends that the statements on which Bhammer's claim relies are not actionable statements of fact. In order to support a claim for misrepresentation, a statement must not be "merely a matter of opinion, estimate, or judgment." *Russell*, 437 Mass. at 458 (internal quotations omitted).

The distinction between fact and opinion is often blurry. "In construing what is the true meaning of the language used, it is often necessary to consider the subject matter, the relationship of the parties, the opportunity afforded for investigation and reliance, and the attendant circumstances." *John A. Frye Shoe Co. v. Williams*, 312 Mass. 656, 665 (1942). Furthermore, "[e]ven a statement that in form is one of opinion 'may constitute a statement of fact if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it.'" *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001) (quoting *McEneaney v. Chestnut Hill Realty Corp.*, 38 Mass. App. Ct. 573, 575 (1995)). Thus, although McDonough's representation that the fund's investment strategy was "appropriate and well-defined" would seem to be a matter of opinion or judgment, those descriptors imply, at a minimum, the fact that Loomis held the *belief* that the strategy had those characteristics. The difference is slight, but it is relevant here where the complaint alleges that Loomis's purported reason for discontinuing the fund was because it did not approve of the strategy; in other words, that Loomis did not, in fact, believe the Angleton Fund's strategy was "appropriate."

Loomis similarly contends that the complaint relies on statements that are non-actionable statements of future plans; for example, Bhammer's assertion that Loomis represented that it was

8

"committed" to the Angleton Fund for the "long term." However, it is possible to assert a claim based on a statement of future intention if that statement was false when it was made; "'statements of present intention as to future conduct may be the basis for a fraud action if . . . the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage.'" *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 226 (1st Cir. 2003) (quoting *McEvoy Travel Bureau Inc. v. Norton Co.*, 408 Mass. 704 (1990)).

Finally, Loomis argues that the complaint fails to allege facts establishing that the statements Bhammer relied on were false, or that Loomis knew the statements were false when made. Both the fact of falsity and the speaker's knowledge of falsity are assessed as of the time the statement was made. *See Cummings*, 244 F.3d at 23.

Here, the complaint adequately alleges facts and circumstances from which it can plausibly be inferred that Loomis's employees knew the statements were false at the time they were made. For example, throughout the course of Bhammer's recruitment, Loomis allegedly represented that the Angleton Fund had "an appropriate and well-defined investment process, strategy and philosophy," Am. Compl. ¶ 16, that Loomis had "reviewed" that process, strategy, and philosophy, *id.* ¶ 17, and that the fund "met the criterion used by Loomis Sayles in determining whether to launch a new fund." *Id.* Those statements are directly contradicted by Loomis's alleged explanation in July 2015 that it was cancelling the fund's launch because it "did not otherwise approve of the Angleton Fund's strategy." *Id.* ¶ 35. In addition, Loomis's alleged frequent representations that it was "committed" to the fund, and that there was "no reason" for Bhammer to delay taking steps to leave Macquarie and Hong Kong are contradicted by Loomis's abandonment of the fund shortly thereafter. Thus, although there may well be other

plausible explanations for Loomis's conduct, the complaint adequately pleads that one such explanation is that the statements were, in fact, false at the time that they were made.

A related requirement for a claim of intentional misrepresentation is that of "knowledge of falsity" on the part of the speaker. *See Eureka Broadband*, 400 F.3d at 68. That requirement is satisfied if

> the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

*See Cummings*, 244 F.3d at 23 (citing Restatement (Second) of Torts § 526). The factual allegations of a complaint must be viewed as a whole. *See Ocasio-Hernandez v. Fortuno-Beset*, 640 F.3d. 1, 14-15 (1st Cir. 2011). Although it is a close call, taken as a whole, the facts recited in the complaint plausibly allege that the relevant speakers either knew that the matters on which they spoke were false or were aware that they did not have a basis for those statements. Accordingly, the complaint adequately alleges a claim for intentional misrepresentation.

### B. <u>Negligent Misrepresentation</u>

To prove the tort of negligent misrepresentation under Massachusetts law, a plaintiff must establish that the defendant

> (1) in the course of her business, or in a transaction in which she had a pecuniary interest, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that she (6) failed to exercise reasonable care or competence in obtaining or communicating the information.

*DeWolfe v. Hingham Centre, Ltd.*, 464 Mass. 795, 799-800 (2013); *see also Cummings*, 244 F.3d at 24 (citing, among others, the Restatement (Second) of Torts § 552(1) (1977)). For the reasons described above, the complaint also alleges sufficient facts to state a claim for negligent

misrepresentation.  *See Cummings*, 244 F.3d at 24 ("Although courts sometimes analyze negligent misrepresentation claims and deceit claims together, the degree of culpability a plaintiff must prove to establish liability for negligent misrepresentation is different, and less demanding, than that to establish liability for deceit.").  Loomis's motion to dismiss Count One will be denied.

### IV. Tortious Nondisclosure (Count Two)

Count Two of the complaint alleges a claim for tortious nondisclosure.  "[T]he tort of nondisclosure arises in a limited number of circumstances where there is a duty to disclose." *Knapp v. Neptune Towers Assocs.*, 72 Mass. App. Ct. 502, 507 (2008).  Massachusetts courts follow the Restatement (Second) of Torts in determining whether a duty to disclose exists.  *See, e.g.*, *id.*; *Stolzoff v. Waste Sys. Int'l, Inc.*, 58 Mass. App. Ct. 747, 763 (2003); *Wolf v. Prudential-Bache Sec., Inc.*, 41 Mass. App. Ct. 474, 476-77 (1996).  Among other circumstances, the Restatement provides that

> One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> > (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
> >
> > (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> >
> > (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; . . . .

Restatement (Second) of Torts § 551 (1977).

Here, at a minimum, the complaint plausibly describes circumstances in which Loomis had a duty to disclose "matters . . . necessary to prevent [its] partial or ambiguous statement of

11

facts from being misleading," or "subsequently acquired information that [it knew would] make untrue or misleading a previous representation that when made was true or believed to be so." *Id.* Loomis's motion to dismiss Count Two will therefore be denied.

## V.     **Tortious Interference (Count Three)**

Count Three of the complaint alleges a claim for tortious interference. In order to state a claim for the tort of intentional interference with advantageous relations, a plaintiff must prove

> (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

*Blackstone v. Cashman*, 448 Mass. 255, 260 (2007); *see also Rando v. Leonard*, --- F.3d ---, 2016 WL 3361662, at *3 (1st Cir. June 17, 2016); *Lashgari v. Zoll Med.*, 84 Mass. App. Ct. 1106, at * 2 (2013).[1]

The primary dispute between the parties concerns whether the defendant's conduct must be directed at a third party, or whether a defendant may be liable for conduct directed at the plaintiff only. It is true that some Massachusetts cases have enunciated the second element of the tort as requiring that "the defendant knowingly induced *the employer* to break [the] relationship." *See, e.g.*, *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 781 (2001); *Shea v. Emmanuel Coll.*, 425 Mass. 761, 764 (1997). However, more recent Massachusetts cases to address the issue do not appear to include that requirement as an element of the tort. *See, e.g.*, *Blackstone*, 448 Mass. at 260; *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 394-95 (2005); *Harrison v. NetCentric Corp.*, 433 Mass. 465, 476-77 (2001).

---

[1] When interference with an actual contract is alleged, courts sometimes refer to the tort as "intentional interference with contractual relations." *See, e.g.*, *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 652-53 (D. Mass. 2015).

The apparent answer to this discrepancy is found in *Shafir v. Steele*, 431 Mass. 365. In that case, the Massachusetts Supreme Judicial Court adopted Section 766A of the Restatement (Second) of Torts, which provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

As the *Shafir* court noted, "the only difference between the torts described in § 766 . . . and § 766A is that, under § 766, the tortious conduct causes the third person not to perform, whereas § 766A involves interference preventing the plaintiff from performing his own part of the contract." *Shafir*, 431 Mass. at 369 (citing Restatement (Second) of Torts §§ 766, 766A comments b and c).[2] In other words, the discrepancy in Massachusetts case law seems to stem from its merging of what is two torts in the Restatement (Sections 766 and 766A) into a single tort under Massachusetts law (intentional interference with advantageous relations).

Neither section of the Restatement directly answers the question of which party must be the target of the defendant's conduct. However, read together, those sections suggest that liability may attach so long as some conduct of the defendant "interferes with" the performance of one of the parties. Under that standard, it does not appear significant for present purposes whether the complaint alleges that Loomis's conduct was focused on Bhammer himself rather than his employer (Macquarie).

---

[2] Section 766 of the Restatement provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.

Loomis also contends that the complaint fails to allege facts that satisfy the element of "improper motive or means." A plaintiff need only allege either improper motive or improper means, but need not allege both. *See Draghetti v. Chmielewski*, 416 Mass. 808, 816 n.11 (1994). It is well-established that a misrepresentation is an improper means of interference. *See id.* at 816 (citing Restatement (Second) of Torts § 767, comment c).

In summary, the complaint adequately alleges sufficient facts to establish the required elements of intentional interference with advantageous relations. Accordingly, Loomis's motion to dismiss Count Three will be denied.

## VI. Conclusion

For the foregoing reasons, the motion to dismiss of defendant Loomis, Sayles & Company, Inc. is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: July 14, 2016              United States District Judge